CONCERNED AREA RESIDENTS FOR THE ENVIRONMENT; Philip Karcheski; Kathleen Karcheski, Individually and as Parents and Legal Guardians of Brian Karcheski and Robyn Karcheski, Infants; Lois E. Link; Daniel L. Wilson; William A. Fagan; Betty C. Fagan; Jeffrey Ferris; Linda Ferris, Individually and as Parents and Legal Guardians of Chad J. Ferris, Stacey P. Ferris and Shawn W. Ferris; Kirk Schroeder, Individually and as Parent and Legal Guardian of Stacy L. Schroeder, Kirk Bly and Vickie Bly, Plaintiffs–Appellants,

v.

SOUTHVIEW FARM and Richard H. Popp, Defendants–Appellees.

No. 1608, Docket 93–9229.

United States Court of Appeals, Second Circuit.

Argued May 16, 1994.

Decided Sept. 2, 1994.

Donald W. O'Brien, Jr., Rochester, NY (Woods, Oviatt, Gilman, Sturman & Clarke; Alan J. Knauf, Knauf, Craig & Doran, P.C., of counsel), for plaintiffs-appellants.

John W. Clarke, Rochester, NY (James H. Ferreira, Harris Beach & Wilcox, of counsel), for defendants-appellees.

(Jeffrey H. Kirby, Glenmont, NY), for New York Farm Bureau, Inc. and American Farm Bureau Federation, amici curiae.

(John J. Rademacher and Michael J. Stientjes, Park Ridge, IL, of counsel), for American Farm Bureau Federation, amicus curiae.

(Lois J. Schiffer, Acting Asst. Atty. Gen., U.S. Dept. of Justice, Environmental and Natural Resources Div., Washington, DC (Anne S. Almy, Nancy K. Stoner, Mark R. Haag; Stephen J. Sweeney, Office of General Counsel, Joseph G. Theis, Office of Enforcement, U.S.E.P.A., of counsel)), for U.S., amicus curiae.

Before: OAKES and MINER, Circuit Judges, and CARTER, Senior District Judge.[*]

OAKES, Senior Circuit Judge:

This is a citizen's suit under the Clean Water Act of 1977, 33 U.S.C. §§ 1251 *et seq.* (1988 & Supp. IV 1992), ("CWA" or the "Act"), with some state law claims for nuisance, negligence and trespass. The suit arises on account of the liquid manure spreading operations of a large dairy farm in western New York. After denial of a motion to dismiss the complaint and of a motion for summary judgment, the case proceeded to jury trial. *See Concerned Area Residents for the Env't v. Southview Farm,* 834 F.Supp. 1410 (W.D.N.Y.1993) (*"CARE I"*). Following a jury verdict in plaintiffs' favor on five CWA violations and the state law trespass claim, the United States District Court for the Western District of New York, David Larimer, *Judge,* granted judgment to the defendants as a matter of law on the five CWA violations. *Concerned Area Residents for the Env't v. Southview Farm,* 834 F.Supp. 1422 (W.D.N.Y.1993) (*"CARE II"*). The court left standing the verdict and damages of $4,101 on the trespass count. *CARE II,* 834 F.Supp. at 1435–37.

The appeal by plaintiffs involves only the five CWA violations and raises anew the question what is a "point source" within the meaning of 33 U.S.C. § 1362(14), a question this court touched upon in *United States v. Plaza Health Labs., Inc.,* 3 F.3d 643, 649 (2d Cir.1993) (holding that, for purposes of criminal liability, a human being is not a point source under the CWA), *cert. denied,* — U.S. ——, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994). The appeal also concerns whether the liquid manure spreading operations fell within the "agricultural stormwater discharges" exception to point source discharges under the Act. 33 U.S.C. § 1362(14).

We now hold that the liquid manure spreading operations are a point source within the meaning of CWA section 1362(14) because the farm itself falls within the definition of a concentrated animal feeding operation ("CAFO") and is not subject to the agricultural exemption.

## I. Background

Plaintiffs, who refer to themselves collectively as Concerned Area Residents For the Environment ("CARE"), are a group of land owners who live near Southview Farms, a dairy farm in the town of Castile, in Wyoming County, New York. Defendants are the farm itself, and Richard H. Popp, an

---

[*] The Honorable Robert L. Carter, *Senior District Judge,* Southern District of New York, sitting by designation.

individual. Southview Farm is one of the largest dairy farms in the State of New York. It employs twenty-eight full-time and nine part-time employees. As of 1992, it owned 1,100 crop acres and had an animal population of 1,290 head of mature cows with over 900 head of young cattle, heifers and calves, making a total of 2,200 animals.

Unlike old-fashioned dairy farms, Southview's operations do not involve pasturing the cows. Instead, the cows remain in their barns except during the three times per day milking procedure. Also unlike old-fashioned dairy farms where the accumulated manure was spread by a manure spreader, Southview's rather enormous manure operations are largely performed through the use of storage lagoons and liquid cow manure. The storage lagoons number five on the main farm property ("A Farm"). One four-acre manure storage lagoon has a capacity of approximately six-to-eight million gallons of liquid cow manure.

In connection with this particular manure storage lagoon, Southview has installed a separator which pumps the cow manure over a mechanical device which drains off the liquid and passes the solids out through a compressing process. The solids that remain are dropped into bins for transport while the liquid runs by gravity through a pipe to the four-acre manure storage lagoon. This separated liquid was apparently used for the purpose of washing down the barns where the cows are housed.

Insofar as application of the manure as fertilizer to the land is concerned, there is a center pivot irrigation system for spreading liquid manure over the fields. The diameter of the circle of this irrigation system can be modified to conform to the field on which the application is being made. A series of pipes connects the pivot to the liquid manure storage lagoons. The pivot is self-propelled with the height of the arc from the manure spray being somewhere between 12 and 30 feet.

Southview also spreads its manure with a hard hose traveler which is a long piece of plastic tubing on a large reel. The traveler can be unwound and has a nozzle on the end which can send liquid manure 150 feet in either direction making a 300–foot–wide swath for purposes of fertilizing farm fields. The height of the arc from the projected spray is "a couple of feet higher" than that of the center pivot irrigator. Since 1988, a piping system consisting of a six-inch aluminum pipe and running under both the state highway and a town road to a lagoon on at least one Southview Farm other than the "A Farm," has transported liquid manure from the storage lagoon to various locations without the use of vehicles.

Southview also uses conventional manure spreading equipment including spreaders pulled by tractors and self-propelled vehicles which, generally speaking, have a 5,000 gallon capacity for liquid manure. These vehicles were used to spread manure from the smaller lagoons on the "A Farm" which do not receive liquid manure processed through the separation system. Southview's manure spreading record reflects the application of millions of gallons of manure to its fields.

## II. Procedural Posture

On May 9, 1990, the plaintiffs notified Southview Farms and Richard H. Popp that they intended to sue the defendants for violations of federal and state environmental laws in connection with Southview's manure operations. (Letter of 5/9/90 from Alan J. Knauf, attorney for CARE, to Richard H. Popp.) On January 22, 1991, the plaintiffs filed the original complaint. Complaint, *CARE v. Southview Farms*, No. 91–6031 (W.D.N.Y. filed Jan. 22, 1991) ("Original Complaint") and on May 31, 1991, they filed an amended complaint. Complaint, *CARE v. Southview Farms*, No. 91–6031 (W.D.N.Y. filed May 31, 1991) ("Amended Complaint").

On May 19, 1993, after a three-week trial commencing April 26, 1993, the eight-person jury returned a verdict in favor of the plaintiffs on five of the eleven CWA violations which had been submitted to the jury for its consideration. On July 1, 1993, the defendants filed a motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b). On October 19, 1993, the court granted in part the defendants' Fed.R.Civ.P. 50(b) motion for judgment as a matter of law ("judgment m.o.l.," formerly judgment notwithstanding

the verdict or "judgment n.o.v."), *CARE II,* 834 F.Supp. at 1437, and a final judgment was entered thereafter.

On November 18, 1993, the plaintiffs timely filed a notice of appeal. This court has jurisdiction under 28 U.S.C. § 1291 (1988).

### III. Standard of Review

The moving party bears a heavy burden to prevail on its motion for judgment m.o.l. Fed.R.Civ.P. 50(b); *Stubbs v. Dudley,* 849 F.2d 83, 85 (2d Cir.1988), *cert. denied,* 489 U.S. 1034, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989). In ruling on such a motion, the court must "consider the evidence in the light most favorable to the [non moving party] and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence." *Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 367 (2d Cir.1988). To grant a judgment m.o.l., the court must find that there is " 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [it].' " *Song v. Ives Lab., Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992) (quoting *Mattivi v. South African Marine Corp., "Huguenot",* 618 F.2d 163, 168 (2d Cir.1980)).

### IV. Discussion

The CWA provides that, absent a permit and subject to certain limitations, "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a); *see Plaza Health,* 3 F.3d at 645. A pollutant includes "solid waste, . . . sewage, . . . biological materials, . . . and agricultural waste discharged into water" and thus includes the manure in this case. 33 U.S.C. § 1362(6). A "discharge" is "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The term "point source" includes "any discernible, confined and discrete conveyance, including but not limited to any . . . concentrated animal feeding operation. . . . This term does not include agricultural stormwater discharges and

return flows from irrigated agriculture." 33 U.S.C. § 1362(14). Our basic questions on review then are whether the defendants discharged the manure pollutant from any point source into navigable waters and whether the agricultural stormwater exemption or any other limitation applies.

The plaintiff-appellants' contentions relate to five specific CWA violations which the jury found but the district court overturned on the defendants' motion for judgment m.o.l. These specific violations are as follows:

(1) A July 13, 1989, violation on field 104 on the so-called Wyant Farm, located to the east of Middle Reservation Road and bordering on Letchworth State Park through which the Genesee River runs. As to this violation, two of the plaintiffs observed liquid manure flowing into and through a swale on the Wyant Farm and through a drain tile leading directly into a stream which ultimately flows into the Genesee River.

(2) July 12, 1989, and August 22, 1989, violations as to which the district court concluded that the jury finding of a discharge was "sheer surmise and conjecture." While the district court concluded that there was a "complete absence of substantial evidence supporting the verdict," the appellants argue that there is strong circumstantial evidence adequately supporting the jury's conclusion with respect to these violations.

(3) September 26, 1990, and April 15, 1991, violations as to which the appellants claim that the district court erroneously set aside the jury verdicts because no reasonable juror could find that the discharges were not excepted under the Act as agricultural stormwater discharges.

It is at this point that the United States amicus position and the position of the appellants tend to coincide, if not directly meet. It is significant to note, as previously stated, that the cows are not put out to pasture. The fields to which the manure is applied, as above indicated, are used for crops. The United States appears as amicus curiae in support of the appellants on the basis that, because the Southview operations involve more than 700 cattle, it is a facility which is defined in the regulations under the Act as a

CAFO, and therefore one type of "point source" under the Act, thereby requiring a permit for discharges which was not obtained in this instance. As we have stated, the Act defines the term "point source" as including "any . . . concentrated animal feeding operation." 33 U.S.C. § 1362(14). In this connection, the district court concluded that, as a matter of law, Southview was not a CAFO because crops are grown on a portion of the farm. The United States contends that Southview is a CAFO as a matter of law because crops are not grown in the feed lot in which the milking cows are confined.

In the following discussions we explore the appellants' contentions in turn and then discuss the United States' position as amicus with respect to the September 26, 1990, and April 15, 1991, CWA violations which is opposed by the New York State Farm Bureau as amicus.

## A. July 13, 1989, Violation on Field 104

The July 13 violation, found by the jury but overturned by the district court, as we have said, occurred on field 104 on the Wyant property which shares the boundary line with Letchworth State Park. Field 104 contains a slew or swale which tends to collect liquid manure spread by Southview's tankers and conveys it through a pipe in a stonewall and through the stonewall itself into a ditch which runs for some length on the Southview property before it reaches the boundary of the state park.

On July 13, 1989, appellants Kirk Bly and Philip Karcheski observed the manure collecting in the slew or swale and flowing into the ditch which in turn flowed off of the Southview property into Letchworth State Park property, and, in turn, joined a stream which ultimately flowed into the Genesee River. (Transcript of 4/30/93 at 9 ("Bly Testimony")); (Transcript of 4/28/93 at 6 ("Karcheski Testimony")).

The district court held and appellees contend that the July 13 discharge was not a point source discharge because the liquid simply and quite naturally flowed to and through the lowest areas of the field, and that the pollutants reached the stream that flows into the Genesee "in too diffuse a man-

ner to create a point source discharge." The district court also suggested that the pollutants were not "collected" by human activity but in fact the opposite occurred in that the manure was dispersed over the ground.

The appellants argue that, given the testimony and the photographic evidence (reprinted in Joint Appendix at 216, 218–223) before the court, even if the liquid manure flowing from field 104 into the swale could be characterized as "diffuse run-off," as the district court characterized it, the manure pollutant was nevertheless thereafter channelled or collected sufficiently to constitute a discharge by a point source. Alternatively, the appellants contend that the appellees' liquid-manure-spreading vehicles themselves may be treated as point sources because 33 U.S.C. § 1362(14) defines a point source to include a "container" or "rolling stock." They point out that a number of district court cases have found vehicles to be within the definition of point sources. See, e.g., Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897, 922 (5th Cir.1983) (bulldozers and backhoes constitute point sources under the CWA); United States v. Tull, 615 F.Supp. 610, 622 (E.D.Va.1983) (bulldozers and dump trucks), aff'd, 769 F.2d 182 (4th Cir.1985), rev'd on other grounds, 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987); United States v. Weisman, 489 F.Supp. 1331, 1337 (M.D.Fla. 1980) (bulldozers and dump trucks). They urge that by pumping the liquid manure from Southview's various lagoons into manure spreading tankers and other vehicles before discharging the liquid manure on to its various fields, Southview has "collected by human effort" the pollutant discharged into the navigable waters. See Plaza Health, 3 F.3d at 651 (Oakes, J., dissenting).

■ We agree with the appellants on both counts. We believe that the swale coupled with the pipe under the stonewall leading into the ditch that leads into the stream was in and of itself a point source. As this court has previously noted, the definition of a point source is to be broadly interpreted. Dague v. City of Burlington, 935 F.2d 1343, 1354 (2d Cir.1991), rev'd on other grounds, — U.S. ——, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992);

see also *Sierra Club v. Abston Constr. Co.,* 620 F.2d 41, 45–46 (5th Cir.1980) (defendants were engaged in strip mining operations and placed their overburden in highly erodible piles which were then carried away by rain water through naturally created ditches); *United States v. Earth Sciences, Inc.,* 599 F.2d 368, 374 (10th Cir.1979) (discharge from a large capacity reserve sump serving a gold extraction process could be a point source even though "the source of the excess liquid is rainfall or snow melt"). In *Sierra Club,* the Fifth Circuit held that a defendant is not relieved from liability simply because it does not actually construct the conveyances "so long as they are reasonably likely to be the means by which the pollutants are ultimately deposited into a navigable body of water." *Sierra Club,* 620 F.2d at 45; *see also United States v. Oxford Royal Mushroom Prods., Inc.,* 487 F.Supp. 852, 854 (E.D.Pa.1980) (discharge resulting from spraying overabundance of water onto surface of an irrigation field which, in turn, ran off into a nearby stream through a break in a berm around the field may constitute discharge from a point source). Here, the liquid manure was collected and channelized through the ditch or depression in the swale of field 104 and thence into the ditch leading to the stream on the boundary of the Southview property as it adjoins Letchworth State Park. Nothing in *Plaza Health* is to the contrary. There the court simply refused to treat a human being as a "point source" under the criminal provisions of the Act by virtue of the rule of lenity. *Plaza Health,* 3 F.3d at 649.

■ Moreover, we agree with the appellants that, alternatively, the manure spreading vehicles themselves were point sources. The collection of liquid manure into tankers and their discharge on fields from which the manure directly flows into navigable waters are point source discharges under the case law. *See, e.g., Tull,* 615 F.Supp. at 622; *Weisman,* 489 F.Supp. at 1337; *Avoyelles Sportsmen's League, Inc. v. Alexander,* 473 F.Supp. 525, 532 (W.D.La.1979); *see also* Karcheski Testimony at 8 (testifying that, on July 12 and 13, tankers were used to spread manure onto field 104); Bly Testimony at 7–8 (same).

The district court also believed that the defendant's actions were "the kind of activity that Congress wanted to keep beyond the reach of the Act," like irrigation return flows or storm-water runoffs. Again, we disagree, for reasons that appear below in our discussion of the position of the United States.

**B. July 12, 1989, and August 22, 1989, Violations**

■ Bly and Karcheski observed liquid manure spreading and tracked it down field and downstream on July 13, the day after they observed the spreading in the same field of "a large amount of liquid manure." In particular, Bly stated that, "on July 12, 1989," "[t]here was a racetrack type pattern in the field, and what caught my eye was a running light in the far corner of the field." Bly Testimony at 6. Bly observed Southview vehicles for several minutes and made an entry on his calendar indicating "dumping in [the] corner of [the] field, above stream, across from Wells' farm." Bly Testimony at 6–7. Karcheski on that same evening at dusk while driving on Middle Reservation Road, "noticed a light" "in the southeastern corner of [field 104]," Karcheski Testimony at 3, and returning about an hour or so later observed tanker trucks entering the Wyant Farm property via a field adjacent to field 104. Each testified that the same spreading activities were occurring on both July 12 and July 13. *See* Bly Testimony at 7–8; Karcheski Testimony at 7.

Similarly on August 22, 1989, both Bly and Karcheski observed Southview's vehicles spreading manure on the same field. Bly testified that "again, this is the same field, same area, and again, I noticed a heavy application of manure had been applied again." Bly Testimony at 11. Karcheski testified that "the tankers were coming down the road again and entering the same area, and I waited until they went by, and I turned around and came back." Karcheski Testimony at 8.

The district court held that the jury's finding of a discharge on July 12, 1989, and August 22, 1989, was "sheer surmise and conjecture" because the plaintiffs' offered no direct eyewitness testimony of manure actu-

ally leaving Southview property on those dates. This finding overlooks the strong circumstantial case made out by the plaintiffs and also disregards the standard applicable to a Rule 50(b) motion for judgment m.o.l. As we stated earlier, but now stress:

> In ruling on a motion for a judgment n.o.v., the district court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court " 'cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.' "

*Lightning Bolt Prods.*, 861 F.2d at 367 (quoting *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir.1987) (quoting *Mattivi*, 618 F.2d at 167)); *see also* Fed.R.Civ.P. 50(a); *Toltec Fabrics, Inc. v. August Inc.*, 29 F.3d 778, 782 (2d Cir.1994).

We believe that the jury was justified in inferring that the same activities that Bly and Karcheski observed in detail on July 13, 1991, probably had the same result on July 12, 1989, and August 22, 1989, namely that they were violations of the Clean Water Act at field 104. Proof of three subsequent discharges of liquid manure from the same field on April 14, 1991, April 15, 1991, and October 4, 1991, coupled with plaintiffs' trial exhibits depicting discharges which were observed and photographed on those days further buttressed the testimony of Bly and Karcheski. *See* Photographs (*reprinted in* Joint Appendix at 216, 218–23). Although those particular subsequent discharges were not included as specific point source discharges within either the amended or supplemental complaints, they provided the jury with additional evidence with which to infer that violations of the Clean Water Act did occur on both July 12, and August 22, 1989. As stated in *O'Brien v. Nat'l Gypsum Co.*, 944 F.2d 69, 72 (2d Cir.1991), "it is beyond any doubt that circumstantial evidence alone may suffice to prove adjudicative facts." *See also Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 10–11, 5 L.Ed.2d 20 (1960); *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1184

(2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). The fact that the evidence of the point source discharges "is circumstantial does not render the jury's conclusion conjectural." *In Re Joint Eastern and Southern Dists. Asbestos Litig.*, 798 F.Supp. 925, 931 (E. & S.D.N.Y. 1992), *rev'd on other grounds*, 995 F.2d 343 (2d Cir.1993) and 995 F.2d 346 (2d Cir.1993).

## C. September 26, 1990, and April 15, 1991, Violations

We believe the district court also erred in setting aside the jury's verdict on the September 26, 1990, and April 15, 1991, violations on the basis that "no reasonable juror could find that these discharges were not excepted under the Act as agricultural stormwater discharges." *CARE II*, 834 F.Supp. at 1430. The district court drew this conclusion even though it had given explicit instructions to the jury on the availability of the "agricultural stormwater" exemption under 33 U.S.C. § 1362(14). *Id.* at 1429.

We agree with appellants that, while the statute does include an exception for "agricultural stormwater discharges," there can be no escape from liability for agricultural pollution simply because it occurs on rainy days. For guidance in our analysis, we examine the legislative and regulatory history of this exception which the court relies upon in arriving at its conclusion.

■ The exemption at issue was added by the Water Quality Act of 1987, Pub.L. No. 100–4 § 503, 101 Stat. 7, 75 (1987). Because Congress mandated comprehensive regulations of certain forms of industrial and municipal stormwater run-off under 33 U.S.C. § 1342(p), one can infer that Congress wanted to make it clear that agriculture was not included in this new program. We agree that agricultural stormwater run-off has always been considered nonpoint-source pollution exempt from the Act. *See, e.g.,* 40 C.F.R. § 122.3(e) (1993) (excepting "introduction of pollutants from non point-source agricultural and silvicultural activities").

We think the real issue is not whether the discharges occurred during rainfall or were mixed with rain water run-off, but rather,

whether the discharges were the result of precipitation. Of course, all discharges eventually mix with precipitation run-off in ditches or streams or navigable waters so the fact that the discharge might have been mixed with run-off cannot be determinative. Accordingly, we must uphold the verdict to the extent that the jury had a reasonable basis to find that the discharges on September 26, 1990, and April 15, 1991, were not the result of rain, but rather simply occurred on days when it rained. We first examine whether the jury had a reasonable basis to find that these two violations were not the result of rain. We then examine whether the alleged violations must be categorized as "agricultural stormwater discharges," or whether they fall into the CAFO exception.

### 1. The Jury's Findings

■ As to the September 26 discharge, Karcheski testified that, "after a rain[ ] and manure had been applied on the field, [the manure] was literally running off everywhere up and down those field-type areas." Karcheski Testimony at 14–15. Similarly, Bly testified that he "could see the manure flowing, the tracks made by the equipment, flowing off the end of the field where there was severe erosion." Bly Testimony at 16. The New York State Department of Environmental Conservation Report ("D.E.C. Report"), *reprinted in* Joint Appendix at 227, while indicating that the run-off was attributed to "heavy rain," also points out that the "[f]ields have been saturated with liquid manure and farm continues to spread in same area." Sally Hunt, a witness who is not a party but who lives near the Karcheskis, testified that Southview Farms had spread the manure which "had pooled in the corner of their field right next to our property ... larger than I had seen before, and it had been pooled there, and then it rained.... Then it drizzled into the ditch and through the drainage pipe." (Transcript of 5/5/93 at 4). We think the jury could properly find that the run-off was primarily caused by the over-saturation of the fields rather than the rain and that sufficient quantities of manure were present so that the run-off could not be classified as "stormwater."

As to the April 15, 1991, discharge, Karcheski testified that there was "a lot of manure [was] coming off the field through the areas where the banks had fallen away and ... tractors had come in and out, and they leave culverts or furrows and that. There was primarily in the bottom it had a lot of manure coming off." Karcheski Testimony at 20. Bly testified that, on April 14, 1989, he "observed heavy manure applications, once again, to this field" and "brown" "water runoff flowing off the field towards the fencepost." Bly Testimony at 28, 39. Photographs were received in evidence, and, based upon these photographs and Bly's testimony, the jury could have found a discharge unaffected by rain "on or about April 15, 1991." Similarly, as to the April 15 incident, the D.E.C. Report, *reprinted in* Joint Appendix at 226, while attributing the incident to rain, noted that there was "[e]xtra heavy application of manure in fields" and a "heavy cover of liquid manure."

### 2. CAFO Exception To Nonpoint Source Provisions

The New York Farm Bureau, Inc., and American Farm Bureau Federation, as amici curiae, ("Farm Bureau amici"), argue that agricultural activities are regulated as "nonpoint sources" under the Clean Water Act and are not subject to citizens' suits enforcement. They point out that the Act had its origin in the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1251 *et seq.*, and that this act focused on "point source" discharges. The 1972 amendment imposed effluent limitations through a federally mandated and supervised permit system, the National Pollution Discharge Eliminations System (N.P.D.E.S.), Pub.L. No. 92–500, § 403, 86 Stat. 816, 883 (1972), *modified as amended,* 33 U.S.C. § 1342 (1988 & Supp.IV 1992). The Farm Bureau amici point out that nonpoint sources "were addressed by Congress through the Section 208 planning process which placed primary responsibility on the states." Brief of Farm Bureau Amici at 6 (citing Pub.L. No. 92–500, § 208 (1972), 86 Stat. 816, 839, *codified as amended,* 33 U.S.C. § 1288 (1988 & Supp. IV 1992); S.Rep. No. 414, 92d Cong., 1st Sess. 139, *reprinted in* 1972 U.S.C.C.A.N. 3668

("S.Rep. 414")). Thus, when Congress enacted the 1972 Amendments, it considered and chose to exempt agricultural activities under the Section 208 nonpoint source provisions *"except in the case of [CAFOs]."* Brief of Farm Bureau Amici at 7 ((emphasis added) (citing Pub.L. No. 92–500, § 208(b)(2)(F), 86 Stat. 816, 841 (1972), *codified as amended,* 33 U.S.C. § 1288(b)(2)(F); S.Rep. 414, *reprinted in* 1972 U.S.C.C.A.N. at 3759) (supplemental views of Sen. Dole)).

It is understood that the 1972 framework remains in place and that the revision made in 1977 to the point source definition excluded "return flows from irrigated agriculture," 33 U.S.C. § 1362(14), thereby overriding, in part, *Natural Resources Defense Counsel, Inc. v. Train,* 396 F.Supp. 1393, 1402 (D.D.C. 1975) (holding that the Federal Water Pollution Control Act Amendments of 1972 do not authorize the exclusion of point sources in the agriculture, storm sewer, and silviculture categories from the permit requirements of the N.P.D.E.S.), *aff'd sub nom. Natural Resources Defense Council, Inc. v. Costle,* 568 F.2d 1369, 1382 (D.C.Cir.1977) (holding that the E.P.A. has no discretion to limit regulation of point sources to those it deems most significant). The Congress is said to have made its intent clear in the legislative history which states that the "effect" of the newly created section 402 is to amend section 208(b)(2)(F) and to "exempt irrigation return flows from all permit requirements under section 402 ... and assure that area wide waste treatment management plans under section 208 include consideration of irrigated agriculture." S.Rep. No. 95–217, 95th Cong., 1st Sess. 35 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4326, 4360. The Report further provides:

> In exempting discharges composed "entirely" of return flows from irrigated agriculture from the requirements of section 402, the committee did not intend to differentiate among return flows based upon their content. *The word "entirely" was intended to limit the exception to only those flows which do not contain additional discharges from activities unrelated to crop production.*

*Id.* (emphasis added).

Not disagreeing with any of the above, the United States amicus points out that the Clean Water Act by definition includes in the term "point source," "any discernible, confined and discrete conveyance, including but not limited to, any ... concentrated animal feeding operation...." 33 U.S.C. § 1362(14). The regulatory definition of a CAFO is found at 40 C.F.R. 122.23(b) (1994). This provision defines CAFO as an animal feeding operation ("AFO") that meets the criteria of appendix B, which, as pertinent here denotes that the AFO contains more than 700 mature dairy cattle. 40 C.F.R. 122.23(b). The preambles to the regulations indicate that if an AFO exceeds the relevant number of animal units provided in Appendix B Supp. to Part 122 at (a), the AFO is presumably a CAFO, unless "the only time a discharge of pollutants into navigable waters occurs is during a 25 year, 24–hour rainfall event." 40 Fed.Reg. 54182, 54183 (Nov. 20, 1975) (proposed regulations); 41 Fed.Reg. 11458, 11458 (Mar. 18, 1976) (final regulations); *see also* Brief for United States Amicus at 7. Given that it is undisputed that the feed lot at Southview confines more than 700 mature dairy cattle, Brief for Defendants–Appellees at 4, and there is no claim that the run-offs in question were caused by a 25–year, 24–hour rainfall event, we face the question whether the fact that crops are grown on the fields, even though the cattle at Southview are not pastured on those fields, prevents Southview from being an AFO.

An AFO is defined in the regulations as "a lot or facility ... where the following conditions are met:

> (i) Animals ... have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12–month period, and, (ii) crops, vegetation forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility.

40 C.F.R. 122.23(b)(1). There appears to be no doubt that Southview's feed lot meets the criteria of sub-paragraph (i). The district court held that Southview was not an AFO because crops are grown on fields *adjacent* to the feed lot in which the milking cows are

penned; therefore, according to the court, Southview does not meet the criteria of subparagraph (ii).

■ The district court's holding misreads the regulations and particularly paragraph (ii). A lot or facility is an AFO when it confines and maintains animals on a lot which does not contain vegetation in the normal growing season. The vegetation criterion applies to the lot or facility *in which* the animals are confined. The definition of "feed lot" contained in the regulations setting forth technology-based effluent limitations for such facility supports this interpretation. While the effluent limitation applicable to feed lots is not applicable to Southview because it has not obtained an N.P.D.E.S. permit, 40 C.F.R. 412.12, nevertheless, the regulation lends support to the United States' position, and the view we adopt, that the vegetation criterion pertains only to the lot or facility in which the animals are confined under that definition or "feed lot." It is said to be

> a concentrated, confined animal or poultry growing operation for meat, milk or egg production, or stabling, in pens or houses wherein the animals or poultry are fed at the place of confinement and crop or forage growth or production is not sustained in the area of confinement.

40 C.F.R. 412.11(b). The preamble to this regulation explains that the Environmental Protection Agency ("E.P.A") chose to exclude from the definition those livestock holding areas in which crops are sustained in the area where the livestock are confined because "[u]nder [such] circumstances the combined effect of soil and vegetative assimilation of manure and the lower rate of manure depletion per unit area could reasonably be expected to preclude any significant pollution problem." 39 Fed.Reg. 5703, 5704 (Feb. 14, 1974). There is thus, as the United States amicus brief explains, a two-fold rationality for the exemption from the definition of CAFO for facilities in which animals are confined in vegetated areas. First, the fact that vegetation can be sustained in the area in which the animals are confined suggests a lower density of animals in that area or otherwise they would eat or trample all of the vegetation. Second, the vegetation itself is helpful in absorbing and reducing the amount of pollution. The E.P.A. regulations probably rely upon confinement in un-vegetated areas as an indicator of the "industrialized" nature of the confinement and therefore they include only such facilities—such as Southview's—within the regulatory definition of "animal feeding operations."

■ We wish to emphasize that the only previous case squarely on point is in conformity with the position we take here. *Higbee v. Starr,* 598 F.Supp. 323, 325 (E.D.Ark. 1984) (hogs confined in finishing houses in which hog waste fell through slats in floors into holding basins and was then spread on neighboring fields; operation held to be a CAFO), *aff'd without opinion,* 782 F.2d 1048 (8th Cir.1985). Accordingly, the district court erred in deciding that Southview does not operate a CAFO based on the growth of crops outside the area in which the cows are confined. Because there are no disputed material facts with respect to whether Southview's feed lot is a CAFO, this court may determine, as a matter of law, that Southview operates a CAFO, which in turn may be defined as a point source and hence is not to be treated as an agricultural nonpoint source operation calling for regulations by the states under the section 208 planning process.

### V. Conclusion

In short, we conclude with the United States as amicus, that Southview has an animal feeding lot operation with a tremendous number of cattle in a concentrated feeding facility in which no vegetation is grown; that operation in and of itself is a point source within the Clean Water Act and not subject to any agricultural exemption thereto.

Accordingly the judgment of the district court, setting aside the jury's verdict, is reversed and the cause remanded for further proceedings in accordance with this opinion.