part in the consideration or decision of this petition.

No. 88–975.   DUDLEY *v.* STUBBS.   C. A. 2d Cir.   Motion of respondent for leave to proceed *in forma pauperis* granted.   Certiorari denied.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join, dissenting.

Because the judgment below rests upon a fundamental misconception of this Court's decision in *Whitley* v. *Albers,* 475 U. S. 312 (1986), and conflicts with the approach taken by the vast majority of the Courts of Appeals, including a prior decision of the Second Circuit itself, I would grant the petition for certiorari.   Under the decision which the Court declines to review today, prison officials are essentially held strictly liable under the Eighth Amendment for split-second decisions made in the face of serious threats to the security of the prison facility.   This is precisely the result that our decision in *Whitley* was designed to avoid.

I

On February 4, 1977, the Arthur Kill Correctional Facility was the site of an institution-wide sitdown strike orchestrated and controlled by a group of prisoners known as the "Muslims."   That evening, as respondent, John Stubbs, an inmate at the institution, was walking down the main corridor of C control area of the prison to make a telephone call, he was confronted by a gang of 20 to 30 Muslim prisoners.   The gang was armed with homemade knives up to 16 inches in length as well as other weapons wrapped in sheets.   The mob began to chase respondent through the corridors of the prison, throwing garbage cans and table legs down the hallways.   As respondent ran toward the telephone room, he noticed petitioner, Robert Dudley, and another guard standing in front of a door leading to the administrative control center of the prison.   Neither Officer Dudley nor the correctional officer with him had a firearm, a baton, or a two-way radio.   The prison arsenal, the offices of the prison superintendent, and the prison hospital are all accessible from the administration corridor.

When respondent approached the door to the administration area with the armed mob directly behind him, Officer Dudley and the other corrections officer entered the administration corridor and secured the door from the other side.   Officer Dudley refused

to open the door to the administration corridor, despite the entreaties of respondent. Respondent then ran down another corridor and jumped over the counter of the telephone room and cried for help. The correctional officers in the telephone room, and one inmate present there, immediately removed themselves to positions of safety. At this point the angry mob caught up with respondent and beat him severely.

Respondent brought this action under 42 U. S. C. § 1983 against petitioner and other corrections officials, alleging that the failure to aid him during the disturbance constituted a violation of his Eighth Amendment rights. The case was tried to a jury before a Magistrate. Officer Dudley testified that he did not open the administration door because he never had the chance to, but indicated that he would not have done so in any event, given the fact that the prison arsenal and the superintendent's office lay on the other side. As he put it at trial, "[T]here is no way you are to allow inmates to go up into that area, especially in that type of situation." Pet. for Cert. 5. In addition, there was expert testimony at trial that Officer Dudley had followed proper procedure in securing the administration corridor door. At the close of the evidence, petitioner asked for an instruction to the jury that his conduct must have been "malicious and sadistic" to support Eighth Amendment liability under this Court's decision in *Whitley* v. *Albers*, *supra*. The trial court rejected petitioner's proposed instruction and instead delivered a "deliberate indifference" charge. The jury returned a verdict against Officer Dudley in the amount of $26,000 for alleged violations of respondent's Eighth Amendment rights.

The Magistrate subsequently granted petitioner's motion for a judgment notwithstanding the verdict. The Magistrate found this case "akin" to the situation presented in *Whitley*, and emphasized that "'prison administrators . . . should be accorded wide ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" App. to Pet. for Cert. 5b, quoting *Whitley*, *supra*, at 321–322 (citation omitted). The Magistrate cited three factors which justified the entry of judgment for petitioner. First, "there was a serious threat to prison security at the time Stubbs sought Dudley's protection." App. to Pet. for Cert. 7b. Second, "Dudley acted without ill will or malice"; and third, "prior to the attack upon

Stubbs, Dudley had no knowledge of either a threat to Stubbs' life, or the possibility that Stubbs would be attacked." *Ibid.* The Magistrate concluded that, "[g]iven the exigent circumstances, it is obvious that Dudley acted quickly to respond to the dangerous situation with which he was confronted. His failure to take into account Stubbs' welfare may have been unfortunate but it cannot fairly be characterized as deliberately indifferent." *Id.*, at 9b.

The Court of Appeals for the Second Circuit reversed the judgment for petitioner and reinstated the jury's verdict. 849 F. 2d 83 (1988). The crux of the lower court's holding in this case is contained in the following passage:

> "*Whitley* involved a full-blown prison riot. In the present case the condition creating the 'prison disturbance' was the Stubbs incident itself: twenty or more angry prisoners wanted to hurt one prisoner. The issue put to the jury was whether the defendant corrections officers acted unconstitutionally in allowing them to do so. The only 'competing institutional concern[ ]' in this context was whether the defendants, by aiding Stubbs, might plausibly put prison security (or their own safety) at risk. This was for the jury to decide under the 'deliberate indifference' standard." *Id.*, at 86 (footnote omitted).

The Court of Appeals noted that there was evidence that the prison's Muslim population had engaged in a "sit down strike" on the day of the incident, but found that "the situation apparently created no unusual threat to prison security." *Id.*, at 86, n. 3.

In *Whitley* this Court analyzed the dictates of the Eighth Amendment in the context of a prison disturbance that involved the taking of a correctional officer as a hostage. In response to the hostage taking, prison officials determined that forceful intervention was necessary to protect the life of the hostage and the safety of the prisoners not connected with the riot. During the assault on a barricade erected by the prisoners holding the hostage, a prisoner was hit in the knee by a shotgun blast. The prisoner brought a § 1983 action against prison officials, claiming violation of his Eighth Amendment rights. The District Court directed a verdict for the prison officials, finding that the use of deadly force was justified " 'under the unique circumstances of this case.' " 475 U. S., at 317. The Court of Appeals reversed, find-

ing that because the prison riot was subsiding at the time the rescue plan was carried out, a reasonable jury could find that the use of force entailed a " " "deliberate indifference" " " to the injured prisoner's Eighth Amendment rights. *Id.*, at 318.

This Court reversed, noting that the "deliberate indifference" standard of *Estelle* v. *Gamble*, 429 U. S. 97 (1976), "was appropriate in the context presented in that case because the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities." *Whitley*, 475 U. S., at 320. The Court found that the balance must be struck differently where prison security and the safety of both prison officials and inmates is threatened. "In this setting, a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Ibid.* Accordingly, the Court set out the following test to be applied in such cases:

> "Where a prison security measure is undertaken to resolve a disturbance, such as occurred in this case, that indisputably poses significant risks to the safety of inmates and prison staff, we think the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Id.*, at 320–321 (citation omitted).

The Court indicated that the standard it enunciated applied to "prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline." *Id.*, at 322. Decisions made "in bad faith or for no legitimate purpose" are not insulated from review, but judge and jury may not substitute their judgment as to the reasonableness of the action taken by prison officials. Unless an inference of wanton and sadistic infliction of pain arises from the facts as pled, "the case should not go to the jury." *Ibid.*

The Court of Appeals' determination that "deliberate indifference" was the correct Eighth Amendment standard under which to assess the correctional officer's action in this case is directly contrary to our decision in *Whitley*. The court's opinion acknowl-

edges that the very kind of "competing institutional concerns" present in *Whitley* were present here, but then goes on to find that the deliberate indifference standard was appropriate. The situation here was arguably *more* dangerous than in *Whitley*, where, although a hostage had been taken, the situation had stabilized and the correction officials had time to plan a course of action. Here a split-second decision had to be made. A single door stood between armed prisoners, who had engaged in a sit-in earlier in the day, and the prison arsenal and the office of the prison superintendent. Application of the deliberate indifference standard in a setting like this one essentially renders prison officials strictly liable for putting the security of the prison and the lives of *all* its inhabitants before the physical security of one inmate. In this case, if Officer Dudley had attempted to aid respondent by opening the door, and tragedy had ensued, he would no doubt have been subject to disciplinary action by his superiors, not to mention state law tort liability for any ensuing injuries caused by his decision.

The judgment here also conflicts with the decision of another panel of the Second Circuit which held that the *Whitley* standard applied to a correctional officer's use of force in the face of an explosive situation created by a prisoner's use of racial slurs in a crowded cafeteria and his subsequent resistance to orders to leave the scene. See *Corselli* v. *Coughlin*, 842 F. 2d 23, 26 (1988) ("*Whitley* is distinguishable on the facts, since that case involved a full-scale prison riot and the incident here was far from that. Nevertheless, the test under *Whitley* applies . . ."). Moreover, no other Court of Appeals has interpreted *Whitley* as limited to "full-blown prison riots," and it is clear that this case would have been decided differently in other Circuits in the country. See, *e. g.*, *Hines* v. *Boothe*, 841 F. 2d 623, 625 (CA5 1988) (applying *Whitley* where single prisoner resisted order to return to his cell); *Holloway* v. *Lockhart*, 813 F. 2d 874, 879 (CA8 1987) (applying *Whitley* standard to use of tear gas to end occupation of prison day room); *Ort* v. *White*, 813 F. 2d 318, 323 (CA11 1987) ("Although *Whitley* was decided in the the extremely volatile context of a prison riot, its reasoning may be applied to other prison situations requiring immediate coercive action").

## II

While the resources of this Court are scarce, and the judgment the Court declines to review today is aberrational enough that correction within the Second Circuit appears likely, in my view the great potential for disruption of prison security engendered by the judgment of the Court of Appeals in this case merits the strong medicine of summary reversal. There are 64 state run correctional institutions within the jurisdiction of the Second Circuit with a total prison population of over 40,000 inmates. U. S. Dept. of Justice, Sourcebook of Criminal Justice Statistics—1987, pp. 449, 493 (1988). The Federal Government runs five correctional institutions within the same geographic region, housing almost 4,000 federal detainees. U. S. Dept. of Justice, Federal Prison System, Monday Morning Highlights, Jan. 23, 1989. In all of these institutions, prison officials and correctional officers must now choose between their sworn duty to maintain the security of the institution and the dictates of the Eighth Amendment as interpreted by the Second Circuit. Because nothing in the Constitution creates such a Hobson's choice, and because this Court has explicitly so held in *Whitley*, I would grant the petition for certiorari and reverse the judgment below. I respectfully dissent.