Reid & Priest, New York City, Stephen H. Kinney, Jr., for plaintiff.

Victor A. Kovner, Corp. Counsel, New York City, Phyllis K. Saxe, Asst. Corp. Counsel, for defendants.

Carlos SOBA, Plaintiff,

v.

Sgt. McGOEY, Det. McComiskey, Police Officers O'Brien, Blackwell, Langan, Police Department, and the City of New York, Defendants.

No. 83 Civ. 6085 (RPP).

United States District Court, S.D. New York.

Oct. 17, 1990.

OPINION

ROBERT P. PATTERSON, Jr., District Judge.

This is a motion by defendants Detective McComiskey ("McComiskey") and Police Officer O'Brien ("O'Brien") pursuant to Rule 50 of the Federal Rules of Civil Procedure for (a) a directed verdict and (b) for judgment notwithstanding the verdict and, pursuant to Rule 59 of the Federal Rules of Civil Procedure, for a new trial. Fed.R. Civ.P. 50, 59. For the reasons set forth below, the motion is denied.

Plaintiff Carlos Soba ("Soba") brought this action *pro se* in 1983, alleging that several police officers had used excessive force in effecting his arrest. Motions for summary judgment were made prior to trial and were granted as to defendants Police Officers Blackwell, Langan, the Police Department, and the City of New York, but denied as to defendants Sergeant McGoey ("McGoey"), McComiskey, and O'Brien, who fired a total of fourteen shots at the plaintiff on March 12, 1982 when they were effecting his arrest for armed robbery.

A jury trial was held on August 1, 2 and 3, 1990. The jury returned a verdict in favor of McGoey and against McComiskey

and O'Brien and awarded Soba $60,000 in compensatory damages. The jury found that McComiskey and O'Brien had acted wantonly or maliciously but did not award punitive damages.

## BACKGROUND

The underlying facts leading to the events in question were not disputed at trial. Soba was one of four persons who committed an armed robbery of Emmi's Tavern located at the corner of 39th Street and Second Avenue in Brooklyn, New York, in the evening of March 12, 1982 in front of more than 30 patrons. Plaintiff and at least one other accomplice were armed with sawed-off shotguns. The four robbers parked their car at 40th Street, near the corner of Second Avenue and walked to Emmi's Tavern. Plaintiff had his sawed-off shotgun in his belt in view of the patrons while he emptied the cash register. The other robbers kept the crowd under control or acted as lookouts.

Meanwhile, McGoey and Police Officer Blackwell ("Blackwell"), responding to a call of 'robbery-in-progress' arrived at 39th Street and Second Avenue in a police car. A robber exited the bar as they approached, dropped his shotgun after Blackwell fired two shots, and fled up Second Avenue. McGoey, in police uniform, chased the man up Second Avenue, while Blackwell called for assistance, and reported that shots had been fired. McComiskey, O'Brien and Langan heard the call "shots were fired" while their car was heading for 39th Street and Second Avenue in response to the 'robbery-in-progress' call.

Meanwhile, Soba, finding himself in the bar with his accomplices departed, took the money and exited the bar turning to his left and, grasping his sawed-off shotgun in both his hands, proceeded on the sidewalk up Second Avenue towards 40th Street in an endeavor to get back to the car.

Near the corner of 40th Street, he came across McGoey who was looking for the robber who had preceded Soba to 40th Street and had turned the corner. Soba was admittedly carrying the sawed-off shotgun in plain view. He testified the gun was pointing past his shoulder, off to his left side, at a 45 degree angle upwards from a horizontal position. At this point, Blackwell shouted to McGoey to warn him of Soba's approach and that Soba was armed. McGoey heard Blackwell's shouting and turned to see Soba and the shotgun and fired six times in rapid succession, emptying his revolver. Soba did not fire his shotgun.

At or around the time McGoey and Soba confronted each other, McComiskey and O'Brien, in the car travelling down Second Avenue from 41st Street to 40th Street, saw the confrontation, pulled over towards the sidewalk, jumped out of the car, and fired six and two shots, respectively, at Soba. Soba did not fire his gun. Of the fourteen shots fired by one or all the officers, Soba received six different wounds.

### The Conflicting Testimony

The testimony at trial and the briefs on this motion conflict particularly on the sequence of events during the shooting.

Soba contends that McGoey started shooting at him, that he felt a bullet hit his stomach, at which he yelled, "Que pasa? I surrender," that he then felt a bullet hit him in his left hand (Transcript of Testimony ("Tr.") 73, 194), and/or his left shoulder, which turned him counterclockwise (Tr. 168) and, then, felt a bullet hit his right leg (Tr. 168).

He testified, "The Sergeant turned, and when he turned he shot me in the stomach.... Then I said, 'Well, what's happening? I give up.' And that's when I felt the other shot in my hand that broke this, and then the ones in the back started shooting." (Tr. 73) He similarly testified that after the first officer shot him, "the other one started to shoot me, the ones behind" (Tr. 168).

McGoey testified that he fired six shots at Soba and had no idea whether he hit Soba (Tr. 228) but that while he was firing, Soba's upper body twisted to his right in the direction of McComiskey and O'Brien (Tr. 238). McGoey also testified that at some point Soba twisted to his right so that he was looking up 40th Street in the di-

rection of 40th Street and Second Avenue; that "Simultaneously as I was firing I saw flashes out of the corner of my eyes, and I realized that the anticrime unit was there, Detectives McComiskey and O'Brien and Langan had pulled up and were also firing." (Tr. 224)

McComiskey testified that he was in the right front passenger side of the unmarked police car driven by Officer Langan down Second Avenue at about 41st Street when he heard the radio call "shots were fired," that he drew his revolver, saw a flurry of activity in the corner of 40th Street and Second Avenue, that he saw the uniformed officer chasing an unknown male from 39th to 40th Streets along Second Avenue, and saw the unknown male make a left up onto 40th Street; that the car then made a screeching halt, that as McComiskey exited the car he saw Soba carrying the sawed-off shotgun come up and McGoey, who was at the building line, turn to face Soba and that he could see McGoey firing at Soba. At this point McComiskey testified that "Soba did a complete 90–degree turn and faced me. I fired all six shots in my revolver." (Tr. 256–7).

McComiskey stated his reasons for firing were "Well, he was as close as you can get, I felt, to me, and when he turned in my direction and I seen that very large hole in that very large shotgun, I thought I was dead, and as I was firing my gun, I was waiting to see the flash from his gun." (Tr. 259)

McComiskey also testified that the split-second after McGoey stopped firing, he fired his six shots at Soba. (Tr. 263) McComiskey testified that all the shots were fired in a period of about four seconds. (Tr. 263).

O'Brien testified he was in the car with McComiskey and Langan and as the car approached 40th Street he saw McGoey and Soba pointing guns at each other about 8 to 10 feet apart; that as he exited the car McGoey discharged his weapon at Soba; that at that point Soba 'turned and pointed the sawed-off shotgun in O'Brien's direction and he discharged two shots at which point Soba fell. (Tr. 298)

## DISCUSSION

The standard for awarding judgment notwithstanding the verdict is the same as the standard applied to a motion for a directed verdict. *Vander Zee v. Karabatsos*, 589 F.2d 723 (D.C.Cir.1978), *cert. den.*, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1978). That standard is whether the evidence presented is such that, without the court weighing the credibility of the witnesses or considering the weight of the evidence, a reasonable person could have reached only one conclusion, different from that reached by the jury. *Stubbs v. Dudley*, 849 F.2d 83 (2d Cir. 1988), *cert. den.*, 489 U.S. 1034, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989); *Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703 (2d Cir.1983); *Mattivi v. South African Marine Corp.*, "Huguenot", 618 F.2d 163 (2d Cir.1980). The Court must view the evidence "in a light most favorable to the non-moving party (giving the non-movant the benefit of all reasonable inferences)" and considering whether "the jury's findings could only have been the result of sheer surmise and conjecture or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *Mattivi, supra*, at 167–68.

The key evidence here is conflicting testimony as to the actual shooting which is difficult to reconcile. In considering it, however, the location of the building line in reference to the witnesses is important. Soba turned left out of the bar (Tr. 108–111) and up Second Avenue on the sidewalk towards 40th Street. This puts the building line on his left. McGoey testified he was at the 40th Street and Second Avenue building line utilizing it for cover, looking around the corner down 40th Street (Tr. 234). Soba agreed that McGoey was located there (Tr. 71–73). McGoey's testimony made clear that, as he faced Soba, Second Avenue was to his left (jury box in relation to witness box in Courtroom 444), and that at the time of the shots Soba was "parallel to me" (Tr. 237). The testimony is uniform

that the two men were 8 to 10 feet apart at the time of the shooting.

The significant difference in the testimony is that Soba claimed he turned counterclockwise, thus away from McComiskey and O'Brien, when the shot hit him in the shoulder (Tr. 168–69), whereas the police officers all testified that he turned clockwise towards McComiskey and O'Brien. (Tr. 238, 257, 298).

Dr. William Stahl, Vice Chairman of the Department of Surgery at New York Medical College, testified that the hospital records showed that the plaintiff was injured by six bullets:

1. lower part of the thigh on the right leg;
2. upper part of abdominal wall in front (superficial);
3. through the left shoulder;
4. left forearm;
5. left forearm;
6. left forearm.

(Tr. 194)

■ The doctor's testimony did not corroborate the sequence of the shots. Because of the force of bullets from 8 to 10 feet away, however, the doctor's testimony did tend to corroborate Soba's testimony as to how his body turned because four of the five bullets of a non-superficial nature hit him in the left side.

In the light of this evidence, the Court concludes the jury, while accepting McGoey's testimony that he fired in self-defense, rejected the testimony of McComiskey and O'Brien that they fired in self-defense. Since McComiskey and O'Brien did not testify that they were firing to protect McGoey and indeed, testified that Soba was threatening them and no longer facing McGoey, that issue need not be addressed in this opinion.

Having concluded that there was sufficient evidence for the jury to reject McComiskey and O'Brien's testimony that they fired in self-defense with Soba's sawed-off shotgun pointed at them, it was permissible for the jury to infer that their testimony was developed to cover a failure on their part to act properly. The jury would also be entitled to make deductions about the use of excessive force, particularly if it concluded that Soba's back was to McComiskey and O'Brien, that he had been wounded at least three times by McGoey, and he had turned counterclockwise from McGoey and was no longer a threat to him. The jury had more than ample opportunity to assess Soba's credibility during his lengthy cross-examination. Under these circumstances, the Court may not usurp the jury's role of weighing the credibility of witnesses or the weight of the evidence presented. *See Stubbs, supra.*

In view of the jury's disbelief in the defendants' testimony and other evidence, the jury could have reasonably inferred that McComiskey and O'Brien acted maliciously or wantonly, with the result that defendants are not entitled to qualified immunity. *Harlow v. Fitzgerald,* 457 U.S. 800, 816–817, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982). Furthermore, the award of no punitive damages does not vitiate that finding. Instead, it shows that the jury's determination was a deliberate one of awarding compensatory damages to a felon but nothing more.

Accordingly, the Court concludes there was sufficient evidence to support the jury's verdict and the motion for a directed verdict, for judgment notwithstanding the verdict and for a new trial is denied. *See Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 697–98, 82 S.Ct. 1404, 1409–10, 8 L.Ed.2d 777 (1962); *Mattivi v. South African Marine Corp., "Huguenot",* 618 F.2d 163 (2d Cir.1980); *Berner v. Commonwealth Pacific Airl., Ltd.,* 346 F.2d 532, 535–36 (2d Cir.1965), cert. den., 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966).

IT IS SO ORDERED.