Luc **HARDY**

v.

**SALIVA DIAGNOSTIC SYSTEMS, INC., Ronald L. Lealos, Eugene H. Seymour, Richard S. Kalin.**

No. Civ.3:94CV1142 (HBF).

United States District Court, D. Connecticut.

Aug. 29, 1997.

William IVar Haslun, II, Edward T. Krumeich, IVey, Barnum & O'Mara, Greenwich, CT, for plaintiff: ·

Eric W.G. Dawson, Robinson & Cole, Stamford, CT, Robert Banner, New York City, for defendants.

### RULING ON MOTION FOR JUDGMENT AS A MATTER OF LAW

FITZSIMMONS, United States Magistrate Judge.

On July 21, 1997, at the close of the evidence in plaintiff's case, defendants moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a). Defendants contend that plaintiff failed to prove the claims of tortious interference with contract and stock bonus against defendants Seymour, Lealos and Kalin and defamation against SDS, Lealos and Kalin.

*Standard*

Fed.R.Civ.P. 50(a)(1) provides:

If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under controlling law be maintained or defeated without a favorable finding on that issue.

■ The standard for granting judgment as a matter of law under Rule 50(a) (formerly called a motion for directed verdict) is a strict one. *Stubbs v. Dudley,* 849 F.2d 83, 85 (2d Cir.1988), *cert. denied,* 489 U.S. 1034, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989); *see* 9A Wright & Miller. § 2537, at 347. In ruling on a Rule 50(a) motion, the court must consider the evidence "in the light most favorable to the nonmovants," *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 573 (2d Cir.1982), and may only grant the motion if "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there could be but one conclusion as to the verdict that reasonable [persons] could have reached." *Id.* (citing *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)); 9 James Wm. Moore, Moore's Federal Practice § 50.02, 50–9 (3d Ed.1997) (hereafter "Moore's") ("[A] court may grant a motion for judgment as a matter of law if it determines that a reasonable jury could draw inferences from the evidence to support a finding in favor only of one party.").

*Findings of Fact[1]*

*Stipulations of Fact*

1. By Employment Agreement dated February 5, 1993, SDS agreed to employ plaintiff Hardy for a three-year term which commenced on March 3, 1993. [Doc. # 74 at 3].

2. The Employment Agreement contained a termination provision which restricted SDS' ability to terminate Hardy, providing as follows:

> 4.1 *Termination for Cause* The Company shall have the right to terminate this agreement and the executive's employment hereunder immediately, without liability, for "cause" as that term is defined hereunder.

> 4.1.1 *Defined Terms* For purposes of this agreement, "cause" shall mean only (1) intentional malfeasance of any kind, (ii) material malfeasance, or (iii) non-feasance.

[Doc. # 74 at 3].

3. Defendant Lealos attempted to terminate plaintiff's employment in 1994, but was prevented from doing so by defendant Seymour. [Doc. # 74 at 4].

---

**1.** "A motion for judgment as a matter of law must be supported with specific law and facts used as a basis for judgment." 9 Moore's § 50.03, 50–13.

4. In late 1993 and early 1994, SDS was running out of cash and SDS' stock was in danger of being delisted by NASDQ. Efforts to finance SDS did not raise sufficient funds and SDS was in a financial crisis. In the Spring of 1994, SDS raised over $2 million in overseas financing. Whale demanded that plaintiff and defendant Seymour be dismissed by SDS. [Doc. # 74 at 4].

5. Defendant Lealos and Boe met with Whale, including Fred Katz, in or about April, 1994, and discussed ousting plaintiff and defendant Seymour from SDS. [Doc. # 74 at 4].

*Tortious Interference with Contract*

6. In the minutes of the Board of Directors meetings of July 30 and August 1, 1993, the Board approved several "first steps" to save money, including, "[r]eplace Kalin with Connally & Halloran for SEC filings, corporate governance, etc. contingent upon Ron meeting them and subsequent approval. Casey to do as much routine work as possible in Portland." [Pl.Ex. 80 at ¶ 9(c) ].

7. On April 7, 1994, Seymour faxed Kalin a memorandum, with copies to all directors and Attorney Stanton, regarding a telephone call from Fred Katz of Whale Securities. The Memo states in relevant part

During his phone call to me, Mr. Katz threatened me by saying that he would see to it that I personally was subjected to lawsuits for the rest of my life and that Whale Securities would drive the SDS stock down under 50 cents. He also said that he personally would make certain that we were driven into bankruptcy. . . .

I must take this threat seriously. I consider this an extortion attempt! I have notified my personal attorney, Mr. Harold Stanton about this incident and have asked that he call you on Friday morning, April 8th, 1994. Please advise us as to whether this should be reported to the Securities and Exchange Commission, to NASDAQ, to the New York State Attorney General or the Department of Justice.

[Pl.Ex. 50].

8. On Monday, April 18, 1994, Hardy sent Lealos a fax stating

Re: my 50,000 shares

Both you and Gene told me last week that his would be taken care of immediately after the 10–K is filed. Could you please instruct Richard to take care of this *immediately?*

[Pl.Ex. 103].

9. On Monday, April 25, 1994, Hardy faxed comments to Joyce Celnick of Kalin's Office regarding his review of the draft proxy statement. He stated in relevant part, "[f]orm 3 and 4. For the record, I found the phrasing of that section strange (page 5). SDS didn't comply based on the lack of advice by your offices, not because of the individuals' fault." [Pl.Ex. 104, ¶ 4].

10. On Monday, April 25, 1994, Hardy faxed the following Memorandum to Lealos, with a copy to Seymour, regarding the Stock Price Performance Graph.

It is my understanding that in the Executive Compensation section of the proxy, there must be information (graph) showing the relative stock performance of SDS. I didn't see that in Kalin's draft received this a.m. and since there has been prior mistakes and omissions in the past, I want to address that issue right away.

Since Kalin seems to take my remarks and advice personally, as opposed to professionally, I thought I would fax you this information directly so that you can take care of it directly with him. Please note that I am gathering the necessary stock and index information for the proxy. Please call Kalin and let me know what the outcome of your discussion is.

Ron, all these things might be minor, the problem is that I have no way to know *a priori*, and do the best I can to make sure that we comply with SEC regulations.

It definitely irritates me to see in this proxy my name associated with non-compliance: some people might want to take this lightly, I won't.

[Pl.Ex. 155].

11. On Thursday, April 28, 1994, Hardy faxed a memorandum to Lealos, with a copy to Seymour and Kalin, regarding the stock Price Performance Graph with draft language for inclusion in the Executive Compen-

sation section of the proxy statement. [Pl. Ex. 156].

12. Kalin responded to Hardy the same day stating,

Reference is made to your April 28, 1994 fax to Ron Lealos regarding Stock Price Performance Graph.

Please advise me why this graph is necessary. After again reviewing the SEC rules, I continue to locate no requirement for such a graph for SDS. If based on your knowledge, it is required (or SDS is voluntarily electing to provide this), please advise me.

[Pl.Ex. 157].

13. On Friday, April 29, 1994, at approximately 9:15 a.m., Hardy faxed a reply memorandum to Kalin with copies to Seymour and Lealos, stating,

Re: Stock Performance Graph

According to Dow Jones: "beginning January 1, 1993, all publicly traded companies were required to compare their five-year total cumulative return with a broad market indicator and with an industry group of peer companies. This comparison in the form of a performance graph, must be included in eery annual filing with the SEC, and is designed to give shareholders and potential investors a quick snapshot of a company's performance."

I have spoken with our account representative at NASD who confirms this. Same with S & P and Russell. I have also seen recent annual reports (Pfizer, Becton Dickinson, Epitope, etc.) where it is done.

I have a call into the SEC (long to respond) to get the actual wording of this guideline (or whatever it is) for our records. . . . I expect and answer today on all these questions. The text section and the graph are virtually ready anyway. I will fax this to you for your review and inclusion in proxy as soon as I have answers (hopefully this a.m.).

[Pl.Ex. 253].

14. On April 29, 1994, at approximately 10:24 a.m., Kalin faxed Hardy a memo stating that after several hours of research he concluded that SDS was not required to provide a Stock Performance Graph in the proxy statement.

As a side note, I think that as little input with the NASD and the SEC as possible is desirable. I think you should get authority from the President of the Company before you contact any of these agencies on behalf of SDS. My experience with them over 15 years is that you never contact them, except on a no-name basis. When you do contact them you tend to bring to their attention matters that usually are better left not brought to their attention.

A copy of this memo was faxed to Lealos. [Pl.Ex. 58].

15. Ron Lealos terminated plaintiff's employment during a telephone conversation on April 29, 1994. Soon after, at approximately 11:47 a.m., the termination was confirmed in writing by Lealos. [Pl.Ex. 56]. The fax states, "[d]ue to your refusal to accept direct instructions concerning your recent activities, you[ ] are dismissed from your position with SDS, effective immediately."

*Defamation: Libel Per Se*

16. The Minutes of the Board of Directors Teleconference of Monday, May 2, 1994, state,

Ron terminated Luc on Friday, April 29th, due to Luc's clear and consistent refusal to cease and desist with telephone calls to the SEC, Mr. Richard Kalin, and NASDAQ. This situation was discussed at length.

[Pl.Ex. 9].

17. The Minutes of the Board of Directors' Teleconference of Wednesday, May 4, 1997, state,

Luc Hardy presented his opinion that the meeting was not a formal board meeting, and that he did not consider the meeting held on Monday, May 2, 1994 to have been a formal, i.e., valid, board meeting. He has been unable to consult his legal counsel, but will have that opinion within a few days. Ron Lealos advised all present that the company's legal counsel, Mr. Richard Kalin, had reviewed the corporate bylaws as well as the minutes of the May 2nd meeting, and it was his considered opinion

that the meeting was legal and valid, and all actions taken were binding.

[Pl.Ex. 10].

18. The Minutes of the Board of Directors Teleconference of Tuesday, May 17, 1994, state,

> The next order of business was the Board of ratification of Luc Hardy's termination of employment with SDS. After discussion, the Board resolved to establish a negotiation committee, comprised of Dr. Seymour and Mr. Boe, to reach a settlement agreement with Mr. Hardy, to be concluded by the end of May, 1994. Mr. Lealos' termination of Mr. Hardy was held to be a valid action of the Company.

[Pl.Ex. 11].

19. The Minutes of the Board of Directors Teleconference of Tuesday, May 31, 1994, state,

> The third order of business was the discussion and clarification of Mr. Hardy's current situation as pertains to the Company. At the previous Board meeting, the members unanimously agreed that Mr. Hardy was no longer an employee of the Company, would not be named on the proxy statement, and that Mr. Boe and Dr. Seymour would negotiate with Mr. Hardy regarding a severance package. Since that time, at the request of both Mr. Boe and Dr. Seymour, Dr. Barnes has taken over the negotiations, and will continue to do so, with a report to the Board members.

[Pl.Ex. 12].

20. The 1994 Annual Report for SDS states in Item 3 Legal Proceedings:

> The Company is involved in three legal proceedings with a former director and officer, Mr. Luc Hardy. The first, *Hardy v. Saliva Diagnostic Systems, Inc., Ronald L. Lealos, Eugene Seymour and Richard S. Kalin,* [995 F.Supp. 258 (D.Conn.1997)] was brought in United States District Court, District of Connecticut. The complaint lists several causes of action against the Company and the individual defendants, including breach of Mr. Hardy's employment agreement with the Company, intentional interference with contract by the individual defendants, slander and deceptive trade practices. The complaint

seeks damages and punitive damages in an unspecified amount. The Company believes this complaint is without merit as Mr. Hardy was fired for cause and intends to vigorously defend itself. Discovery is ongoing.

[Pl.Ex. 140 at 10–11].

21. The 1995 Annual Report for SDS states in Item 3 Legal Proceedings:

> *Hardy v. Saliva Diagnostic Systems, Inc., Ronald L. Lealos, Eugene Seymour and Richard S. Kalin,* was brought in United States District Court, District of Connecticut by Luc Hardy, a former director and officer of the company. The complaint lists several causes of action against the Company and the individual defendants, including breach of Mr. Hardy's employment agreement with the Company, intentional interference with contract by the individual defendants, slander and deceptive trade practices. The complaint seeks damages and punitive damages in an unspecified amount. The Company believes this complaint is without merit as Mr. Hardy was fired for cause and intends to vigorously defend itself. Discovery is completed.

[Pl.Ex. 141 at 10].

*DISCUSSION*

1. *Tortious Interference*

■ Under Washington law, tortious interference is established when

> interference resulting in injury to another is wrongful by some measure beyond the fact of interference itself. Defendant's liability may arise from improper motives or from the use of improper means. No question of privilege arises unless the interference would be wrongful but for the privilege. Even a recognized privilege however may be overcome when the means used by defendant are not justified by the reason for recognizing privilege.

*Pleas v. City of Seattle,* 112 Wash.2d 794, 804, 774 P.2d 1158, *reh'g denied,* (1989) (quoting *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.,* 283 Or. 201, 582 P.2d 1365 (1978)). Interference can be "wrongful" either by statute, regulation, common law, or established standard of trade or profession. *Id.* Thus, "[p]laintiff must show not only that defen-

dant intentionally interfered with his business relationship, but also that defendant had a duty of noninterference; i.e., that he interfered for improper purpose or used improper means." *Id.* (quoting *Straube v. Larson,* 287 Or. 357, 361, 600 P.2d 371 (1979)).

 "Recovery for tortious interference with a contractual relation requires that the interferor be an intermeddling third party; a party to a contract cannot be held liable in tort for interference with that contract." *Houser v. City of Redmond,* 91 Wash.2d 36, 39, 586 P.2d 482 (1978) (*en banc*) (citations omitted). Instead, recovery for such interference would be through a breach of contract action. *Id.* Employees of a party are third parties only if they were acting outside the scope of their employment. *Id.* 91 Wash.2d at 40, 586 P.2d 482. If an officer or employee of a corporation fails to act in good faith, then he is acting beyond his corporate authority, and good faith means "nothing more than an intent to benefit the corporation." *Olympic Fish Products, Inc. v. Lloyd,* 93 Wash.2d 596, 599, 611 P.2d 737 (1980). "The good faith test merely prevents corporate officers from pursuing purely personal goals with no intent to benefit the corporation." *Id.* at 600, 611 P.2d 737. "Under the good faith test, the question of a corporate officer's intent is one of fact." *Id.* at 602, 611 P.2d 737 (citing *Vassardakis v. Parish,* 36 F.Supp. 1002 (S.D.N.Y.1941)).

 Hardy alleges improper motives of defendants Lealos, Kalin and Seymour in terminating his employment contract, which he contends takes their actions outside the scope of their employment or roles as corporate officers and directors. Hardy urges this Court to "pierce the corporate veil" of the corporation and find the defendants individually liable. "This is only appropriate when an officer or director commits or condones a wrongful act in the course of carrying out his duties, and a lack of good faith can be shown." *Schwarzmann v. Association of Apartment Owners of Bridgehaven,* 33 Wash. App. 397, 403–04, 655 P.2d 1177 (1982). Accordingly, as a threshold issue, "plaintiff must establish that defendants were acting beyond the scope of their duties as officers and directors in order to establish liabilities." *Treichler v. Johnson,* NO. 91–0684 BAC, 1993 WL.69180, *5 (N.D.Cal. March 3, 1993)

(applying Washington law). The Court finds that there is a lack of evidence that any of the individually-named defendants acted in bad faith, or somehow knowingly participated in or condoned wrongful or negligent conduct.

*Count Two: Tortious Interference with Employment Contract*

It is undisputed that Lealos terminated plaintiff's employment with SDS. There is also no disagreement that Lealos, as president of SDS, had authority to terminate employees. As a preliminary matter, the Court finds that the termination of Hardy is the only claimed tortious interference with the Employment Agreement. Significantly, there was no evidence presented that defendants Seymour or Kalin procured the termination of Hardy's employment agreement or participated in Lealos' decision to fire Hardy, nor was there evidence from which such participation could be inferred.

*Seymour*

 The sole basis for plaintiff's claim against Seymour is Seymour's vote as director of SDS to ratify the termination. Indeed, plaintiff testified that he considered Seymour an ally until he filed this lawsuit in July, 1994, naming Seymour as a defendant. The Court finds that the act of ratification is distinguishable from the actual termination. The tortious interference complained of here was Lealos' firing of plaintiff on April 29. Accordingly, Seymour's Motion for Judgment as a Matter of Law on Tortious Interference with Employment Agreement [Count Two] is **GRANTED.**

*Kalin*

 Plaintiff argues that Lealos and Kalin "cooked up" his termination by telephone and fax transmissions. However, no evidence was adduced to support this claim. On the contrary, the record shows Hardy sending a steady stream of faxes to both Kalin [Pl.Ex. 104, 253 (with copy to Lealos)] and Lealos. [Pl.Ex. 157 (with copy to Kalin)]. Simply put, there is no evidence in the record linking Kalin to the decision to terminate Hardy's employment. No evidence was presented that Kalin and Lealos even discussed

terminating Hardy. Rather, the record merely shows that Lealos, acting alone, fired Hardy. Accordingly, Kalin's Motion for Judgment as a Matter of Law on Tortious Interference with Employment Agreement [Count Two] is **GRANTED.**

*Lealos*

■ Lealos argues that there is no evidence that Lealos took any actions outside the scope of his role as President of SDS. Under *Olympic Fish Products, Inc. v. Lloyd,* 93 Wash.2d 596, 600, 611 P.2d 737 (1980), defendant argues that unless he was acting for "purely personal" reasons, plaintiff cannot sustain an action for tortious interference. The Court agrees.

Indeed, plaintiff does not challenge Lealos' authority as president of SDS to terminate employees, nor does he dispute that he contacted the SEC, NASDQ or Richard Kalin. Instead, plaintiff argues that his termination was a pretext for Lealos to increase his own compensation and to please Whale so that they would make him C.E.O. of SDS. As to the first contention, no evidence was presented to establish that Lealos directly profited from plaintiff's termination or that this prospect figured into Lealos' decision making. Moreover, "[g]ood faith ... is not equated with the lack of selfish interest in the financial condition of the corporation." *Id.* at 599–600, 611 P.2d 737. Nor did the evidence support plaintiff's contention that Lealos would enhance his position at SDS if Hardy was terminated, while plaintiff did stipulate that "Whale demanded that plaintiff and defendant Seymour be dismissed." [Doc. # 74 at 4]. Absent from plaintiff's case was any evidence that Lealos was acting for "purely personal reasons" when he terminated plaintiff. Plaintiff did not show that Lealos was acting outside his capacity as President of SDS. Accordingly, Lealos' Motion for Judgment as a Matter of Law on Tortious Interference with Employment Agreement [Count Two] is **GRANTED.**

2. *Tortious Interference with Stock Bonus*

■ There is no dispute that Kalin prepared a resolution authorizing a Stock Bonus of 50,000 shares to plaintiff, signed by both Seymour and Lealos and conditioned on the approval of Whale. The parties also agree that Whale's consent to issuance of the shares was required under an anti-dilution agreement relating to the I.P.O. up to March 4, 1994, and that Whale never gave its consent. The parties have also stipulated that Whale wanted plaintiff dismissed. Therefore, up to March 4, 1994, no individual defendant committed any overt acts which could be regarded as tortious interference with the Stock Bonus.

The record also indicates that after March 3, 1994, and after the April 15 issuance of SDS's 10–K, plaintiff renewed his efforts to receive the 50,000 shares. [*See* Letter dated April 18, 1994, Pl.Ex. 103]. Plaintiff testified that Kalin stated at a board meeting that since Whale's approval was no longer necessary after March 4, 1994, all that was necessary was majority approval by the Board. In May, 1994, after termination of his contract, plaintiff proposed a resolution of 50,000 shares not conditioned on Whale's approval. Director Roy Boe never signed plaintiff's resolution and it was never approved by the Board.

No evidence was offered which established that Lealos, Kalin or Seymour interfered with the issuance of the Stock Bonus in any way, let alone tortiously. Thus, the Court need not reach the question of whether the individual defendants acted for "purely personal" reasons.

Accordingly, defendants Lealos, Seymour and Kalin's Motion for Judgment as a Matter of Law on the Claim of Tortious Interference with Stock Bonus [Count Ten] is **GRANTED.**

3. *Defamation: Libel Per Se*

■ Defamation consists of four essential elements: (1)falsity, (2) unprivileged communication, (3) fault, and (4) damages. *Demopolis v. Peoples National Bank of Washington,* 59 Wash.App. 105, 108–09, 796 P.2d 426 (1990) (multiple citations omitted). Under Washington law, "[t]he court determines whether a communication is capable of a defamatory meaning ... [t]he jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient." *Crossman v. Brick Tavern,*

*Inc.*, 33 Wash.App. 503, 504, 655 P.2d 1206 (1982) (adopting 3 Restatement of Torts § 614).

■ At oral argument, plaintiff argued that there was sufficient evidence presented during his case in chief to support a cause of action for defamation per se through publication of statements harmful to his business and occupation in the corporation's public documents. Plaintiff offered no evidence of special damages. Specifically, plaintiff referred the Court to the Board minutes and corporate annual reports, as well as statements made at the Board meetings.

As a preliminary matter, none of the evidence submitted in support of plaintiff's claim of libel per se is attributable to any of the individual defendants. The Court concludes after careful review of the Board minutes and 1994 and 1995 Annual Reports that these are statements solely attributable to the corporation. Indeed, careful review of plaintiff's testimony does not attribute any oral statements made at the post-termination Board meetings to any individual defendant. Without a specific statement or document attributable to an individual defendant, this Court concludes that the minutes of the Board and the Annual Reports are the statements of a corporation, not individual board members or employees.[2]

*Falsity*

■ "Truth is a complete defense in any action for civil libel." *Ward,* 41 Wash.2d at 865, 252 P.2d 253. In this case, SDS's statements regarding this litigation are accurate. Plaintiff filed this lawsuit on July 12, 1994, alleging the causes of action summarized by defendant in the annual report. It is also true that SDS believed that the termination was "for cause". The Board's ratification of Hardy's termination constituted a corporate act confirming this position. The Court also concludes that the statements made in the minutes of the Board Meeting accurately recount what the Board was told about the events of Hardy's termination.

*Qualified Privilege*

■ Even if the statements were made, a qualified privilege may insulate a maker from liability for an otherwise defamatory statement unless it can be shown that the privilege was abused. *Bender v. Seattle,* 99 Wash.2d 582, 600, 664 P.2d 492 (1983). The burden of establishing abuse of a qualified privilege rests on the defamed party, who must show by clear and convincing evidence the declarant's knowledge of the falsity, or his or her reckless disregard as to the falsity of the statement. *Lillig v. Becton–Dickinson,* 105 Wash.2d 653, 658, 717 P.2d 1371 (1986); *Bender,* 99 Wash.2d at 601, 664 P.2d 492. "[A] determination of whether the publication was privileged is a question for the court to decide as a matter of law." *Parry v. George H. Brown & Assoc.,* 46 Wash.App. 193, 196, 730 P.2d 95 (1986).

■ While extra-judicial statements regarding litigation are not afforded an absolute privilege, *Demopolis,* 59 Wash.App. at 109, 796 P.2d 426 ("defamatory communications made by a party or counsel in the course of a judicial proceeding are absolutely privileged if they are pertinent or material to the redress or relief sought"), "[a] qualified privilege exists when circumstances are such as to lead persons having a common interest in the particular subject matter correctly or reasonably to believe that facts exist which another, sharing that common interest, is entitled to know." *Parry,* 46 Wash.App. at 196–97, 730 P.2d 95 (citing *Ward v. Painters' Local Union 300,* 41 Wash.2d 859, 865, 252 P.2d 253 (1953); Restatement (Second) Torts § 596 (1977)). The statements at issue were communicated by SDS to the Board of Di-

---

**2.** Notwithstanding plaintiff's argument that the Annual Reports are specifically attributable to Mr. Kalin because he prepared the document, and to Mr. Lealos because he provided a signed an opening statement in the report, this Court can only conclude on the present record that the Annual Report is a statement of the corporation. There is no evidence to support an inference that these two annual reports were statements made by Kalin and Lealos individually, acting outside the scope of their roles as officers or employees of the corporation. Plaintiff has not provided evidence for such a finding. On the contrary, the Annual Reports contain the following statement "[p]ursuant to the requirement of the Securities Exchange Act of 1934, as amended, the Company has duly caused this report to be signed on its behalf by the following persons on behalf of the Company and in the capacities and on the dates indicated." [*See* Pl.Ex. 140 at 25 and Ex. 141 at 17].

rectors and/or were disclosed by SDS in its Annual Report. After review, the Court finds that the "common interest" test has been met. *Id.* at 197, 730 P.2d 95. ("A communication among partners concerning a partnership lawsuit to recover money owed the partnership is clearly within this "common interest" area.")

 Here, the Annual Reports at issue are of public record regarding pending litigation against SDS and contain a brief and accurate statement of plaintiff's claims. Plaintiff does not challenge the propriety of SDS's disclosure of pending litigation in the Annual Report. Considering the statement of legal proceedings in the 1994–95 Annual Reports, and considering the evidence in a light most favorable to plaintiff, this Court finds that even if they were false, a qualified privilege insulated the corporation from liability for these statements.

Indeed, the Court has found that the Board Minutes contain a brief and accurate statement concerning the Board's consideration of the termination of Hardy's employment. Clearly, the SDS Board of Directors had a common interest in the Hardy termination. The Court finds no evidence of abuse of the qualified privilege adduced in plaintiff's case in chief. *Parry,* 46 Wash.App. at 197, 730 P.2d 95 ("Proof of knowledge or reckless disregard as to the falsity of a statement is required to establish abuse of a qualified privilege."). "To prove actual malice, plaintiff must show that the defendant in fact entertained serous doubts as to the truth of the statement; it is not shown by a mere failure to investigate." *Id.* Plaintiff did not met this standard of proof.

*Damages*

Finally, it is undisputed that plaintiff presented no evidence of special damages. Plaintiff asserts that proof of special damages is unnecessary where the defamation is per se. A written publication is libelous per se (actionable without proof of special damages), if, among other things, "it tends to harm one in his business or occupation." *Ward v. Painters' Local Union No. 300,* 41 Wash.2d 859, 863, 252 P.2d 253 (1953) (citing 3 Restatement Torts, §§ 569, comment 3, 573, comment c) (multiple citations omitted). "A plaintiff's reputation or character is commonly presumed to be good in defamation cases." *Crossman v. Brick Tavern, Inc.,* 33 Wash.App. 503, 504, 655 P.2d 1206 (1982) (citation omitted). Since the Court has already determined that the first two elements of defamation, falsity and unprivileged communication, were not met, we need not determine whether the statements were libelous per se.

Accordingly, defendants' Motion for Judgment as a Matter of Law on the claim of defamation against Lealos, Kalin and SDS is **GRANTED.**

*CONCLUSION*

For the reasons stated, the individual defendants' Motions for Judgment as a Matter of Law are **GRANTED** as to Count Two for Tortious Interference with the Employment Agreement, Count Five for Defamation and Count Ten for Tortious Interference with Stock Bonus.

Judgment as a matter of law is also granted to SDS on the claim of defamation.